The next case on for argument is Mejias v. Malloy and Napier. I'm disappointed that I didn't have the strength to do it myself, Your Honor. I'm sorry. Perhaps not green enough. Good morning. Good morning, and may it please the Court. My name is Benjamin Wattenmaker. With me is Stephen Humes. We represent the plaintiffs and the appellants in this case. This appeal raises two principal issues. First, whether the district court erred when it concluded that the act did not violate the contract clause to the United States Constitution. Mr. Wattenmaker, you may be tapping the top of the podium. Oh. It's coming back through the sound system. Nervous habit, Your Honor. Yeah, no, totally understood. Just I want to make sure that Judge Winter hears the argument and isn't distracted by it. Yeah, I can hear. Okay, thank you. And the second issue is whether the district court erred when it found that the act did not violate the equal protection clause. This court should hold that the district court's decision is erroneous as a matter of law and should be reversed. Turning first to the contract clause claim, the district court's decision on that point is flawed for two principal reasons. And the first reason is that the district court concluded that the state had the right to sweep money from the energy funds, principally because the contract between the plaintiffs and the utilities, or the EDCs, did not expressly prohibit the state from sweeping the funds or transferring the money outside of the funds to the general fund. Our position is there's no principle of contract law that supports the district court's decision. Well, I think maybe you're mischaracterizing the district court's decision. I mean, it seems to me that what the court found is that there's nothing in the contract that requires or compels the state to spend the money in any particular way. In fact, that's not a term in the contract. It's not clear it even could be. Yes, I agree. That is an important part of the court's reasoning as well. But I don't have the citation to the memorandum of decision, but at page A192 of our joint appendix, the court clearly says that the state can sweep money from the energy funds because the contracts, quote, do not expressly prevent the transfer of money out of the energy funds. And so our position is these funds, speaking simplistically, or think about the individual checking accounts that are sitting over there that you can't spend down without the permission of the state or are they're not sitting in the state treasury. We know that. That's exactly right, Your Honor. I believe it appeared from the district court's decision that you might have, that the court might have been confused as to that point. It looked like the court assumed. We're not confused to it. I understand. Tell me where these. The funds are sitting with the utilities, the bank accounts that are controlled by the utilities. Utilities have a fiduciary role over the accounts. They're like attorney trust fund accounts? Approximately. They're heavily regulated by the relevant statutes. Right. The state is saying to the rate payers you add, sorry, it's saying to the utilities you charge your rate payers, make them pay an additional mill or whatever it is. That's right. And you're going to put that money aside in a separate account, and you're going to use that for green and renewable energy. Right. So there's a plan that is adopted and has to be approved, at least as far as the clean energy fund, by the commissioner of the Department of Environmental Protection. But once that plan is approved, the utilities have great control over how the funds are actually spent. For instance, they select all the contractors that are used or hired to run these home energy audits that are available to the rate payers if they request it. They write the checks. They conduct the efficiency. They conduct the analysis of whether these are done efficiently. And they don't have to go back to the state every time they cut a check. They don't have to go back to the state. I was going to ask that question. And that's an important point. They don't have to go back to the state to make all these decisions. There's the commissioner, signs off, and then it's the fiduciary responsibility of the utilities to make sure the plan is faithfully executed. But the state doesn't have it. That has nothing to do with the contract between the utilities and the rate payer, right? That has to do with the arrangement between the state and the utilities in the initial legislation. Well, it becomes relevant for the, I believe it's part of the equal protection analysis, if that's your question. But the contract between the rate payers and the EDCs does, in our view, give the plaintiffs or the rate payers a right as to how the funds are spent. In other words. Where in the contract does it say that? That's just, what are you relying on? Right. So we're relying on, well, several of them are identified in the brief. One of them is the monthly statement, which tells rate payers on a monthly basis that the funds that you're charged every month are going to be used for the energy funds. It just basically recites what the state has told the utilities they can do with the funds that they're required to collect. And it's a representation to the rate payers that this money that's being collected is going to be used for a designated purpose and not being just simply sent to the general fund. In addition, the, we talked about this in our brief at page A-167 of the joint appendix, the explanation of charges, does enumerate the uses for which the funds can be spent. And the language was interpreted by the district court as merely descriptive. And our contention is that the district court didn't, it was a conclusory analysis, didn't interpret that language with attention to principles of contract interpretation as articulated by the State of Connecticut where a contract must be construed so as to give full meaning and effect to all of its provisions. Here, the district court merely read those terms out of existence entirely. And our contention is that's entirely inconsistent with contract interpretation under Connecticut law. It would also lead to an absurd result in that it would vitiate any kind of limits on how the funds could be spent. It would be absurd to think that the EDCs could take the funds and buy their executives Jeep Wranglers for Christmas. Hummers them. Personal preference, Your Honor. Okay. In any event, there, so in addition to. So even though there is not an approval check by check, there is a set of approval, sorry, a set of factors that apply to what they can be spent on. Yes, yes. And they're expressed in the tariff. And they're also set out in the enabling statute 16-245 M and N. Now, what's important about those statutes is that they're incorporated by reference into the tariff. And I've recited to Deming, which is the Connecticut Supreme Court opinion, statutes existing at the time a contract was made become a part of it and must be read into it, just as if an express provision to that effect were inserted therein. So our contention is that the language that's set out in these, in 245 M and N, is incorporated in the contract, becomes a term of the contract between the plaintiffs and the EDCs, and the state can't infringe that contract by taking the funds and removing them, taking them to the general fund.  Yes. But I'm going to add five minutes to each of your sides because I have some more questions. Should I continue now or should we? No, no, no. You're not switching because you don't get out of it that easy. I want to confirm an understanding that there are municipal utilities also operating in Connecticut. That's correct. And they are subject to the same, I'll call it withholding or additional taxation of fees that go into a similar program, but not the same one. They're not subject to this particular? No, I know that. But I just want, they're set up the same way, have the same sort of fund, but it's a different one, and they have not been, had that fund switched over to pay into the state treasury. That's my understanding, Your Honor. Okay. Is that a basis for your equal protection argument? Yes, that's correct. And it's not simply that the funds are being charged to the rate payers of the two investor-owned EDCs in Connecticut and not to the municipal funds, but then we're comfortable with the fees being assessed to the rate payers. The problem becomes when the funds are removed from the energy funds and used for the purposes for which they're designated and transferred to the general funds. That, in our view, becomes a tax. And there's a tax, that constitutes a tax on the rate payers of the EDCs that is not assessed as to the consumers of the municipal funds. Do I understand that this, what we're here discussing, has happened in prior years as well? It has to a much smaller extent, Your Honor. Were those funds repaid once the state got back on its feet, if it did? Or if you don't know, you can just say. My understanding is that they were in the earlier funds, not these sweeps, which were for $145 million over two years. The earlier funds were paid back? That's my understanding. Okay. And so, putting aside the- Do you know if these are going to be paid back? Well, that's what we're trying to do here, Your Honor. Well, I know you're trying to get them paid back, but there's nothing that tells us whether there is any obligation on the part of the State of Connecticut to pay them back once they- Nothing is- Once they get on their feet. I don't mean to interrupt. Nothing that's in the act itself that requires, let's hope the state gets back on its feet. Absolutely. Absolutely. We all wish that. Anything else at this point? Since I've already gone over, why don't I just- Well, you're not over. You've got two and a half minutes left. Then I'll proceed. I did want to mention the filed rate doctrine, which our argument is that it applies in this case, and we believe that the trial court, the district court, I should say, gave it short shrift in its memorandum of decision. It's a doctrine that's applied as a matter of common law, and it's been codified into the state statutes, General Statute 16-19. And it provides that the tariff is not just a creature of contract. Bless you, Your Honor. It also has a force of law, and that there cannot be retroactive modification of the tariff absent action by pure- How is this a modification of the tariff? I mean, it's just it's taking the monies that the tariff imposed or allowed to be imposed or required to be imposed, but moving them someplace else. I mean, the rate payers don't get to say, unless they're stockholders and have enough votes, how a utility gets to spend its money that it takes in. Our position is that they don't get to tell the utility how to spend its money, but they do have a say, they do have a right as to how the money in these funds are spent. The monies are held by the EDCs, but the EDCs, it's our contention, have a sort of a trustee fiduciary responsibility to make sure that the funds are used as set out in the enabling statutes, which we contend are incorporated into the tariff. The contract between the plaintiffs and the EDCs become the terms become a part of that contract. And even the district court's decision stated that that portion of the enabling statutes that articulated the intended purposes of the energy funds did set limits on how those funds could be used. Once those terms are incorporated into the contract, as we contend that they have been, they become part of the bargain. And I'd just like to point out before my time expires that the State actually made an argument trying to incorporate Public Act 17-2 into a tariff of its own. So this isn't a rogue argument that I'm making here. This is a part of, an established part of Connecticut interpretation of contracts that the State relies on as well. Thank you very much. You've reserved two minutes for rebuttal. Mr. Miller, good morning. Good morning, Your Honor. That podium's got more work out today than probably in the month. Yes, Your Honor. Your Honors, may it please the Court, Assistant Attorney General Philip Miller, and I'm representing all the State defendants in this action. Turning to the Contracts Clause, I think there's actually just one question that's dispositive of this, And that's simply, do Connecticut General Statutes 16-245M and N create a contractual obligation on behalf of the State that they must use that money in these funds that they've created only for energy efficiency purposes and not use it for anything else? And the plaintiffs conceded in their reply brief that these statutes on their own do not create any contractual right. And that's real. They're saying the contract between the rate payer and the utility, which consists of monthly bills that state what's being taken out and that it's being sent for the purposes of this arrangement, and the tariffs between them sort of constitute a contract. Right. And the problem with that argument is there is some contract. Obviously, the rate payers are paying a bill and the energy companies are providing electricity. So there is some contract there. But the problem is what they're trying to do is they're trying to bind the State to a private contract. So that term they want to bind the State to, if it existed, and I don't think it does anywhere in the language, is that the State may only use the money for the energy efficiency purposes and can't use it anywhere else. Well, the only way the State can be bound to that term is if the State has agreed to be so bound. And since the legislature created the scheme and they created the funds and they directed how the funds would be spent and what they would be spent on, Your Honor, the only way they could be bound is if that language in those enabling statutes, 16-245 M and N, those create contractual rights. And if they don't, it is simply a policy choice that the legislature said, okay, right now we're going to spend it this way. But what they did is in Public Act 17-2 and then 1881, they amended the statutes. They amended 16-245 M and N and said, notwithstanding what we said previously, we're going to have you divert for a two-year period some of the money out of those funds into the general fund. And they're going to be used to pay for highways and the limo for the governor and various other things. Or homeless. Yes, Your Honor. Other will be spent for something else. Or assisting folks who are having housing problems and that sort of thing. Yes, Your Honor. It just seems, and it's me, I'm sure, but it just seems very odd that the state tells folks, and I come from Vermont, and if you know anything about Vermont utility regulation, what everybody's talking about up there, this is the headset I have on because I have to listen to it. It seems very odd that the state says to the utility, as it can, or as it's certainly permitted to, you have to do these various programs and trap these funds, hold them, and use them on green energy and renewable energy. And the utilities go do that, and they trap them and hold them and expect to expend them on green energy and utility. Sorry, renewable energy because we're all trying to be good world citizens and deal with global warming and that sort of thing. And the state comes in and says, well, you know that those energy funds that have been set up and that you're holding, well, we're not going to take them and do something else with them. Yes, so, Your Honor, I understand. I mean, I understand where you're coming from, but this is. Just assuage my concerns that. So this is the legislative prerogative with all due respect to this court. And so the legislature can, when they created this whole system, they could have done it in one of two ways. They could have tried to create a contractual right to basically say we can only do this. We're making a contractual promise with you. EDCs and ratepayers will never move this. They didn't do that here. So they just created statutes. They created a policy. And, you know, Connecticut, as I think you understood, we had some bad budget times a few years ago. So the legislature did what they had to do. They got together in a room, and they had to make compromises. And they decided that, you know, they didn't take all the money away. They took about a third of it over those two years. And they said, listen, we've decided, the legislature decided, that there's a better use, a more important use at this time for that money. And now I wouldn't – No, that's fine. And I don't mean to cut you off, but I just have a particular point. Could you just make it clear for me, is this one pot of money that's sitting out there under one dome, or does each of the utilities have its own pot and the state comes in and takes it in proportion? Yeah, so my understanding is each utility, there's UI and Eversource. They each have their own fund. And then there's also – And that contributed proportionately to when the treasurer came in and said, write us a check, each of them wrote? I think they contributed because UI has many less customers than Eversource. So I believe it was all proportionate to the amount of money in the fund. And there's also – so that is just the CL&M fund. There's also the funds that go to the Green Bank. So that's sort of a different – that's a quasi-public entity. So there's a – and there's a different source that goes to the Green Fund there. So I think what I was saying to your question, Your Honor, is, you know, that was – you know, the legislature has difficult choices, and that's what they made. But I wanted to point out that as of, I believe, January 1, 2020, the statute's been amended. And the way it is now going to operate, this is my understanding, is they're getting rid of the funds, actually. Now, they're still going to pay the charge, but now those charges are going to go into, I think, the utilities' own funds. And now the utilities will still have to only spend that money on whatever the plan tells them to. But I think they wanted to try to make it more difficult in the future to have just a nice fund separate and apart from the utilities' other funds that they could take. I think that was part of the compromise they reached when they did this raid here. So there has been an amendment, as I believe it's January 1, 2020, Your Honor. So, Your Honor, if these – I think to your point, Judge, so if these two statutes don't create a contractual right, then unless the legislature would have told the EDCs or PURA or the Department of Environmental Protection, we give you the authority to so bind us, and there's nothing in the record to suggest they did, then there's just no contractual term that can bind the State. I think that's where we get to on that, Your Honor. And, again, I think that's why the district court said, listen, we understand the language. It is descriptive in nature, but it does not bind the State because the State has never indicated, contrastually, it would be so bound. So what you're saying is that they're effectively saying, if they had a contract with their clients, with their rate payers to say, and 10 percent of the taxes we pay will go towards renewable energy, they don't get to say that. That's not a promise they get to make. Correct, Your Honor. The EDCs could – I mean, maybe they have some action against the EDCs for making that promise, but they can't bind the State to a promise between two private parties unless the State agrees to be bound by that promise. And there's nothing in the statutes, especially, that suggests they agreed to be so bound. Why aren't they private monies? Say again, Your Honor? Why aren't they private monies? I'm not sure I understand what you mean, Your Honor. I mean, the State's just said you've got to set up this program, but the money is yours. You mean the money is the EDCs? The money is the utilities money that it has to use in a certain way. It's not the State's money at all. So it's not the EDCs money, because I think they said there's a fiduciary relationship. It is the money came from the rate payers into these funds that the State made clear from the enabling statutes, the State controls how that's spent. So what has to happen is the EDCs with the electric EEB, they come up with a plan. The plan is approved by the Commissioner of the Department of Environmental Protection, and that's how the money can be spent. The EDCs cannot spend one dime of that money without permission. And what will often happen is the EDCs will want to spend it on, say, I think they want to spend it on solar this year, but solar isn't doing as well. Not as many people want solar, so they'll get permission. Can we spend it on energy efficiency improvements or something like that? So they're constantly trying to move the money around to make sure they spend it all. But they can't do anything without the State's authority to spend that. So, you know, they just, that's just the way the State chose to set it up, but it's clearly under State control, Your Honor. You know, turning to the, I'll turn to the Equal Protection Claim unless there's anything else on the contract. So turning to the Equal Protection Claim, again, I think there's one question to ask, and is this transfer, so what we have, again, we have transfer of money from EDC accounts that they have to set up, required by the State, and it's just transfer to the general fund. So, you know, just push a couple buttons on some computers and we move money from one fund to the other. Is that fund a tax? And if the answer, if it's not a tax, then there can be no Equal Protection Violation because their whole Equal Protection Claim is based on the EDC, or rate payers from EDCs are taxed and municipal rate payers are not. So if this is not a tax, there's no classification, no Equal Protection Violation. And I guess I go back to what is a tax? And if you look at any definition of a tax, it is basically the imposition telling a rate payer, you must take some of your own money and you will give it to the State. I mean, that's generally what a tax is. That happened in this case, but earlier, when the rate payer paid their bill, that, the tax is in 16-245 M&N. And the planners have made very clear they're not challenging that, probably for good reason, because if that was a violation, one of the ways we could fix it is just get rid of the program. Obviously, they wouldn't want that. So they're not challenging the actual payment of money from the rate payers to the State through the EDCs. What they're challenging now is just this later transfer of money from one pot to the other. And I just simply submit that that's just not a tax, Your Honor, as the district court explained. That is just simply a, at this point, the rate payers don't have any interest in that money. And the money belongs to the EDCs to be spent the way the State claims. Now, the planners did make a couple quick arguments, since I don't get rebuttal, I'll mention now. I think what they, they claim they have a legitimate claim of entitlement, one, because, well, they have an, they should be able to get to use this program. And I just want to point out that, well, there's no guarantee that any rate payer can use the program. They have the ability to apply for it. But, you know, if everyone all of a sudden wanted to do solar in one year, there certainly wouldn't be enough money in the fund to do all that. So we sort of count on the fact that not every rate payer is going to use this program every year. So certainly they have an interest in the fund, but that's it. And then secondly, they talked about how there's this, the CAM is fully reconcilable at the end of the year, and if they don't spend, if there's a 5% difference, that money has to go back to the rate payers. Well, all that's saying is, Your Honor, at the end of the year, what their goal is is to try to spend every penny that goes in. And there's nothing in the record, and I'm not aware of any time that we've actually given any money back to the rate payers. I think we do a pretty good job of, as you can imagine, right, the government does a pretty good job of moving all that money around to make sure it's all spent. But what happened in this case is when the plan was adjusted to say, okay, we understand there's a sweep, we're going to move money out of the fund. So if there was anything left after that money had already been transferred, I guess that 5% could kick in, but that money's already gone. So they still have no claim of entitlement to that money that went into the general fund. It's gone. That 5% now, if it ever occurred, would only apply at some point if there's any money left from what's remaining to be spent. But as I've said, there's nothing to suggest that there's ever been that spent. Your Honor, one thing else I wanted to say, and I'm just not sure about this answer, you asked the question of has the money been returned in the past. Ben, it was my understanding that it had not been, but I'm happy to, I can go back to deep and see. No, I just, I was curious. I mean, it was one of the things I thought about as I was wrestling with it. Like I know with the securitization statute, what happened was rather than sweep all the money, PURE was allowed to, I think, approve securitization bonds, and therefore the bond funding went toward, into the fund rather than sweeping money out entirely. I don't think that was ever repaid. I think they did it quicker than they thought they would, and some of it was then they canceled the program early. So they didn't take it all. I don't think they took it all. But so I, at least I, in good faith, I don't think we repaid that money, Your Honor. If it's not in the record, that's fine. I'm not aware if they can point it to the record. I'm just not aware it's in the record either, Your Honor. Thank you, Mr. Miller. And unless there's any other questions, Your Honor, I'll wait the remainder of my time and rest on my brief. Judge Winter? No, I have no questions. Thank you. Thank you, Your Honor. Mr. Miller. Mr. Wattenegger? Thank you, Your Honor. Just as a point of clarification, we believe that in paragraph 61 through 63 of the joint appendix, it clarifies that there was a securitization that was ultimately resulted in a payback of the ---- What Mr. Miller told us about. Yes. Thank you. Sorry. So just briefly on the contract clause claim, the State's position that the statute 16245 MNN don't create contractual obligation involving the State, that may be true. It's not our argument. Our argument is that these statutes that limit ---- and thereby become part of that contract, and the State can't infringe those reasonable expectations that the plaintiffs or rate payers have, that the funds that they pay every month in response to their statements that tell them where the funds are going to go, they have reasonable expectation to believe the funds will be used for the purposes for which they're collected. The contract clause is designed to protect just that kind of interference from the State. What's your best case on incorporation? On incorporation? The statute into what? Yes. Deming is a good one. We've got two or three that are cited in there. Actually, there's several. Just off the top of my head, I'm not ---- but I promise you they're in the brief. Oh, and quickly on equal protection, the counsel has mentioned the ---- for the purer decision that reflects that the funds, if they're not spent, will be returned to the rate payers. Now, the question of whether or not they're actually returned because the monies were spent or not, our position is that's not relevant to the analysis of whether the plaintiffs have a property interest in the funds. As a part of the contract, the plaintiffs have an expectation that the funds, they do have a property interest, and at least at a minimum, that portion of the ---- every year, that portion of the funds that they pay for those legitimate purposes. And, in fact, during the years of the sweep, that the sweep would have effectively vitiated their right to receive any kind of refund because the funds were diminished by so much, diminished their expectation of the likelihood of their receiving any kind of repayment for ---- if there's any funds left over. Thank you. Thank you, Your Honor. Thank you, both. Thank you for your arguments. Interesting case. We'll reserve decision.